*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

v

ROBERT LIVINGSTON,

Defendant-Appellant.

UNPUBLISHED
July 10, 2025
2:44 PM

No. 366404
St. Clair Circuit Court
LC No. 22-001907-FH

Before: YATES, P.J., and LETICA and N. P. HOOD, JJ.[1]

PER CURIAM.

Defendant appeals as of right his jury-trial conviction of possession with intent to deliver methamphetamine, MCL 333.7401(2)(b)(*i*). He was sentenced as a fourth-offense habitual offender, MCL 769.12, to 84 to 300 months' imprisonment. We affirm.

## I. FACTUAL AND PROCEDURAL HISTORY

This case arose from the execution of a search warrant on a suspected "flophouse"[2] in Port Huron, Michigan. Edward Townsend rented and lived in a home on 10th Street but allowed multiple people to come there to use and sell drugs. Townsend's home was initially searched in July 2022, but the drug activity there continued. At approximately 6:00 p.m. on August 22, 2022, members of a drug task force executed a search warrant on Townsend's home with Townsend identified as the target of the investigation. The officers announced their presence with a search warrant and rammed open the home's front door.

---

[1] After the panel remanded for a hearing, Governor Gretchen Whitmer appointed Judge Hood to the Michigan Supreme Court.

[2] The police generally characterized a flophouse as a residence that drug dealers would occupy to sell drugs and users would come to make their purchases.

Pertinent to this appeal, four individuals[3] were found in various locations of the home during the drug raid, defendant, Townsend, Carleigh Phelps, and Cristy McClarty. Townsend identified Phelps and McClarty as drug users. When the police entered the home, Townsend and McClarty were in the kitchen, and Phelps was in a back bedroom. Defendant was near the side of the dining room table.

Police yelled at defendant to remove his hands from his pants pockets. When he did so, a pill bottle fell from his right pocket onto the floor.[4] During the search of defendant, a small plastic bag of methamphetamine was also recovered. The methamphetamine was located in the corners of the plastic bag, it weighed 1.4 grams, and the bag corners were tied off, also known as "dealer ends." In defendant's pill bottle, there were pills and another baggie of methamphetamine weighing about 2.8 grams. From the home, the officers also collected baggies and a scale. A note on the table read, "Don't eat my stuff please, thank you, Rob."

At the police station, defendant was advised of his *Miranda*[5] rights. Defendant was asked whether the pill bottle that fell from his pocket belonged to him. In response to that and other questions, defendant did not provide a verbal answer,[6] but shook his head no.

At trial, Port Huron Police Officer Brian Daly was permitted to testify regarding the manner of drug trafficking in flophouses. Specifically, he addressed the market price of methamphetamine, dealer-end baggies, user-end baggies, and drug scales. Unlike marijuana, the amount of methamphetamine consumed did not increase the "high" that a drug user experienced. Therefore, the typical user amount was between a quarter and a half gram, "maybe up to a gram." On the other hand, a typical amount possessed by a dealer was over a gram. Officer Daly had never encountered a user that possessed 3.5 grams of methamphetamine. It was opined that a methamphetamine user typically did not possess more than three grams while a typical dealer possessed more than a gram. Drug profile evidence was not necessarily universal, but was addressed on a case-by-case basis. The digital scale in the home had a white crystallized substance consistent with methamphetamine on it, leading one officer to think the substance was methamphetamine; however, it was not tested at the crime laboratory. And, although there was a crack pipe in the home, no crack was found. In fact, no drugs other than defendant's methamphetamine were found. Moreover, the baggie recovered from defendant's pocket reflected dealer-ends, packaging in a manner indicative of sale. But, the testimony at trial demonstrated that no one witnessed defendant engaged in an actual hand-to-hand sale of methamphetamine.

Townsend testified against defendant as part of a plea deal. Townsend pleaded guilty to delivery of a combination of heroin and fentanyl, arising from charges filed in July 2022, and

[3] A fifth individual, simply identified as "Fred," was released shortly after the raid.

[4] A police body camera recorded defendant's actions after they entered.

[5] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[6] Although defendant never provided verbal answers to the police, defendant used another inmate's phone account to call a woman and told her that it would look better for him if he was in rehabilitation.

maintaining a drug house. Two additional drug-related charges from July 2022 were dismissed and Townsend pleaded guilty to a charge of maintaining a drug house arising from the events on August 16, 2022. Yet, Townsend remained subject to a maximum term of twenty years' imprisonment. Townsend's plea was conditioned on providing truthful testimony against defendant and a separate dealer.

Townsend testified that he allowed people into his home to sell and use drugs, and he identified four individuals who did so, including defendant. Townsend had known defendant for five to six years, considered him to be an acquaintance, and consumed crack cocaine with him.

Defendant arrived at Townsend's home 30 minutes before the raid, brought methamphetamine with him, and expressed his intent to sell the methamphetamine. At Townsend's home, defendant also consumed crack. Cumulatively in direct and cross-examination, Townsend testified that defendant sold drugs from Townsend's home although Townsend did not see defendant selling drugs on the day of the August raid.[7] Townsend also opined that defendant had been selling methamphetamine for about a year. And, Townsend witnessed defendant using and selling drugs from the home of Joseph Dane, which was located four to five blocks from Townsend's home.[8]

Defendant waived his right to testify. But, Dane[9] testified about his 40-year friendship with defendant. Additionally, defendant lived with Dane for three months in the summer of 2022. Dane never saw defendant engage in drug deals or transactions at Dane's home. In fact, Dane prohibited drug use in his home. On cross-examination, however, Dane admitted that in 2020 he pleaded guilty to maintaining a drug house and possession of narcotics. Moreover, Dane's home was recently declared a nuisance and boarded up. Dane claimed the nuisance citation was the result of too many 911 calls, but he acknowledged drug overdoses and deaths occurred at his home.

After defendant's conviction and sentence, defendant moved for a new trial and requested a *Ginther*[10] hearing. Defendant claimed that his trial counsel was ineffective for failing to investigate and call Phelps and McClarty[11] as witnesses to rebut Townsend's testimony that defendant sold methamphetamine. It was alleged that trial counsel made no effort to locate and

---

[7] In part, Townsend clarified his testimony when asked about his testimony at the preliminary examination.

[8] At trial, there was also testimony about different types of drug dealers. Some dealers sold drugs as a source of income to support themselves. Other street-level dealers merely sold drugs to support their own drug habits.

[9] Dane was the only witness identified by name on defendant's witness list, the only witness named as a potential defense witness during voir dire, and the only defense witness subpoenaed and called at trial.

[10] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

[11] McClarty's affidavit indicated that she was a relative of defendant's through marriage. Her affidavit was unsigned and the trial court disregarded it for that reason.

call these witnesses despite defendant's request. In a signed affidavit, Phelps averred that she was at Townsend's home at the time of the raid. In a two- to three-month period before the raid, Phelps saw defendant at Townsend's home and did not see him sell drugs. Phelps also never "heard" that defendant sold drugs. Consequently, she concluded that he was not a drug dealer. Phelps claimed that trial counsel never contacted her. Also, in the motion for a new trial, defendant asserted that his conviction was against the great weight of the evidence because he merely possessed methamphetamine without the intent to sell it. In a supplemental filing, defendant submitted his own affidavit, contending that trial counsel failed to investigate Phelps and McClarty.

The prosecution opposed the motion, asserting that defense counsel was not ineffective for failing to call the witnesses because it constituted trial strategy. Furthermore, the content of Phelps and McClarty's affidavits was testified to by Dane, and the jury rejected the contention that defendant did not engage in the sale of narcotics. Moreover, the Phelps and McClarty affidavits[12] only reflected that defendant did not sell to them, not that he did not sell drugs at all. Finally, the prosecution alleged that there was overwhelming evidence to support defendant's conviction in light of testimony regarding how dealers bagged drugs for sale and Townsend's testimony that defendant sold drugs. The trial court denied defendant's new trial motion, determining that the Phelps affidavit did not support the claim of ineffective assistance and the verdict was not contrary to the great weight of the evidence.

After oral argument on the appeal, this Court remanded the matter to the trial court for a *Ginther* hearing.[13] Joshua Rubin, defendant's trial counsel, testified that he had been a criminal defense attorney for approximately 23 years and had conducted between 100 and 200 jury trials. Initially, defendant did not communicate with Rubin. After defendant was arrested for violating the terms of his bond, Rubin met with defendant at least 12 times at the jail. Rubin provided discovery to defendant, including the police reports, the witness statements, and the laboratory reports. Additionally, Rubin brought his laptop computer to the jail to show defendant the police body-camera footage. This video footage clearly showed that defendant had possession of something that he dropped. It turned out to be an aspirin bottle, and at the bottom of the bottle, methamphetamine was discovered. After reviewing this discovery and discussing the case with defendant, it was determined that the defense to the charge would be that any possession of methamphetamine was for personal use only.

When representing a client, Rubin inquired whether the client needed any matters attended to, such as contacting family or a bail bondsman on the client's behalf, and whether there was anything that should be addressed pertaining to the criminal case. Ultimately, Rubin and defendant discussed two main witnesses, Joseph Dane and Ray Bowen. Dane testified at trial and Bowen apparently acted as a property manager at the other location Townsend had identified as a place where defendant sold drugs. Although Phelps and McClarty were listed in the police report, Rubin denied that defendant asked him to locate Phelps and McClarty and subpoena them for trial. Rubin had no notes in his file reflecting that defendant wanted them called as witnesses. Additionally,

---

[12] See footnote 11.

[13] *People v Livingston*, unpublished order of the Court of Appeals, entered February 21, 2025 (Docket No. 366404).

Rubin testified that, in light of defendant's background and involvement in the drug trade, he believed that those witnesses would not be helpful. Rubin testified that if defendant had requested they be interviewed, he would have listed their names on the witness list and made an attempt to talk to them. Moreover, Rubin was "scared" or concerned that Phelps would provide the same information as Townsend or "snitch" type testimony.

Rubin further testified that defendant never advised that Phelps was housed in the St. Clair County Jail. Rather, Rubin learned that Dane was in the jail and made efforts to speak with him. Because Dane was represented by counsel, jail staff did not permit Rubin to speak with him. Dane, however, was released from jail, appeared for the trial, and testified. After discussing Bowen with defendant, they determined that his testimony would not be beneficial, and Bowen was not named on the witness list. Rubin spent more time with defendant than other clients because he knew what was "at stake" for him. Additionally, Rubin could not recall that defendant raised the issue of Phelps's presence during the trial. And, Rubin had reviewed Phelps's proposed affidavit, noting that it contained limited information about defendant and did not deem it particularly helpful.

Brian Peebles was a former border patrol agent who now worked as a private investigator. Defendant's appellate counsel asked Peebles to contact a list of witnesses in preparation for defendant's motion for new trial. Peebles located Phelps at the St. Clair County Jail where he interviewed her, she signed an affidavit, and he notarized it. The affidavit was executed on October 31, 2023. After Phelps signed the affidavit, Peebles had no more contact with her.

In March 2025, defendant's appellate counsel asked Peebles to try and locate Phelps and McClarty. As he did before, Peebles contacted Phelps's sister, who lived out of state. The sister[14] believed that Phelps was staying with a man at drug houses in Detroit or with the man's aunt. Peebles proceeded to the aunt's residence in Roseville, and she indicated that the couple might be staying in Detroit in the area of McNichols and Gratiot. Peebles went to that area on two separate occasions. There, he sought information from shelter and outreach program employees. Peebles learned of a gas station that was frequented by people staying in the neighborhood and the Detroit Police officers that were assigned to patrol the neighborhood. Although a gas station clerk and police officers recognized the couple's photographs, Peebles was unable to locate Phelps. Appellate counsel asserted that Peebles exercised due diligence in trying to locate Phelps and sought to have Peebles testify regarding the statements that Phelps made to him as an exception to the hearsay rule. See MRE 804(a)(5)(A)(ii) and MRE 804(b)(4)(A). The trial court acknowledged that the Phelps affidavit indicated that she frequented the home raided by the drug task force, that she purchased drugs there 5 to 10 times in a 2 to 3-month period, and that she saw defendant there three times during which he was buying and using drugs. But, the trial court concluded that there was no indication that Phelps's statements were contrary to her pecuniary interest or corroborating circumstances to indicate that her statements were trustworthy. Accordingly, Peebles was not allowed to testify regarding Phelps's statements to him. Nonetheless, the trial court admitted and considered the contents of Phelps's affidavit.

---

[14] Peebles also received the contact information of Phelps's mother, but she did not provide useful information.

Lastly, defendant testified that Rubin represented him on the charge of possession with intent to deliver methamphetamine. Defendant denied that Rubin gave him discovery when they met at the county jail. Instead, defendant's appellate counsel gave him the police reports. Additionally, Rubin only showed defendant four minutes of the nearly 50 minutes of video. Defendant asked Rubin to locate and interview Dane, Bowen, McClarty, and Phelps. After further discussion, defendant agreed with Rubin that Bowen would not testify. But, defendant still asked Rubin to call McClarty and Phelps. In response, Rubin indicated that the women would not be important. Defendant testified that he knew that Phelps was in the county jail just before the start of his trial. He saw her near the booking area by the "TV box" and green chairs. Phelps was seated two rows behind defendant, they spoke, and she agreed to testify for him. Defendant also saw Phelps once during his trial.

On cross-examination, defendant admitted that he asked Rubin to call Bowen and Dane. They discussed and agreed that Bowen would not testify. Dane was released from jail the night before he was supposed to testify. Dane appeared at trial and testified on defendant's behalf. Nonetheless, defendant insisted that Rubin did not follow his instructions to contact Phelps. When defendant asked where his witnesses were during the trial, Rubin advised that it did not matter "or something."

Appellate counsel argued that Rubin was ineffective for failing to conduct an independent investigation regarding Phelps and her testimony. It was alleged that Phelps would have testified that she never saw defendant selling drugs to anyone in the home where the raid took place and she was never contacted by Rubin. Phelps would have supported the defense that defendant was merely a drug user and not a drug dealer. Therefore, defendant was prejudiced by Rubin's deficient performance. The prosecution asserted that defendant failed to demonstrate deficient performance, prejudice, and a different outcome. The trial court was required to make credibility determinations in light of the opposing testimony. Rubin adamantly asserted that defendant did not ask him to investigate and call Phelps as a witness, and his testimony was credible. Indeed, defendant agreed that he sought to have Dane and Bowen testify. In response, Rubin listed Dane on defendant's witness list. And, Bowen was not called to testify after Rubin and defendant discussed the matter. Finally, the prosecution challenged the value of the Phelps affidavit, noting that she had limited contacts and knowledge of defendant, and her association with him was through drug use.

Thereafter, the trial court concluded that defendant failed to meet his burden of demonstrating ineffective assistance of trial counsel. Specifically, it found that Rubin's testimony was credible. The court credited Rubin's testimony that he listed and called the witnesses that Rubin and defendant had determined would be beneficial to the defense. The trial court found that Rubin did not have notes regarding McClarty and Phelps because defendant did not request that they be called as witnesses. In making this finding, the trial court cited Rubin's efforts to contact and interview Dane in jail, despite being rebuffed by jail staff. It further determined that it was sound trial strategy not to call additional drug users to testify at defendant's trial for drug dealing. The trial court next found that Phelps's testimony, at best, would have indicated that on three occasions she did not see defendant sell drugs. Thus, Phelps's testimony would have been of neutral value, its omission from trial did not prejudice defendant, and there was not a reasonable probability that a different outcome would have resulted if the testimony had been presented at trial. The trial court later issued a written order denying defendant's motion for a new trial.

## II. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant alleges that the trial court erred by failing to conclude that trial counsel was ineffective and failing to order a new trial when Phelps would testify at trial that defendant did not sell drugs from Townsend's home and that defendant was merely a drug user. We disagree.

The trial court's decision on a motion for a new trial is reviewed for an abuse of discretion. *People v Rogers*, 335 Mich App 172, 191; 966 NW2d 181 (2020). "The question whether defense counsel performed ineffectively is a mixed question of law and fact; [the appellate c]ourt reviews for clear error the trial court's findings of fact and reviews de novo questions of constitutional law." *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). The defendant bears the burden of demonstrating the factual predicate for his claim of ineffective assistance of counsel. *People v Douglas*, 496 Mich 557, 592; 852 NW2d 587 (2014). "[A] trial court's factual findings in that regard are reviewed for clear error and cannot be disturbed unless 'the reviewing court is left with a definite and firm conviction that the trial court made a mistake.' " *Id.*, quoting *People v Armstrong*, 490 Mich 281, 289; 806 NW2d 676 (2011).

The Michigan and United States Constitutions guarantee criminal defendants the right to be represented by an attorney. Const 1963, art 1, § 20; US Const, Am VI. "The constitutional right to counsel is not merely the right to have a lawyer stand or sit nearby; rather, a criminal defendant has the right to the effective assistance of counsel." *People v Otto*, 348 Mich App 221, 231; 18 NW3d 336 (2023). "A defendant must meet two requirements to warrant a new trial because of the ineffective assistance of trial counsel." *Armstrong*, 490 Mich at 289-290. First, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and, second, he must show that, but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different. *People v Yeager*, 511 Mich 478, 488; 999 NW2d 490 (2023).

To demonstrate deficient performance, "the defendant must overcome the strong presumption that counsel's assistance constituted sound trial strategy." *Armstrong*, 490 Mich at 290. That is, defense counsel is given the strong presumption that adequate assistance was rendered and all significant decisions were made in the exercise of reasonable professional judgment. *People v Vaughn*, 491 Mich 642, 670; 821 NW2d 288 (2012). "When reviewing defense counsel's performance, the reviewing court must first objectively 'determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.' " *People v Jackson (On Reconsideration)*, 313 Mich App 409, 431; 884 NW2d 297 (2015), quoting *Strickland v Washington*, 466 US 668, 690; 104 S Ct 2052; 80 L Ed 2d 674 (1984). When applying this standard, a reviewing court must affirmatively consider the scope of possible reasons counsel had to proceed in the manner that they did. *Vaughn*, 491 Mich at 670. Then, the defendant must show that, "but for counsel's deficient performance, a different result would have been reasonably probable." *Armstrong*, 490 Mich at 290.

"The failure to reasonably investigate a case can constitute ineffective assistance of counsel." *People v Anderson*, 322 Mich App 622, 630; 912 NW2d 607 (2018). "The failure to make an adequate investigation is ineffective assistance of counsel if it undermines confidence in the trial's outcome." *People v Grant*, 470 Mich 477, 493; 684 NW2d 686 (2004). To succeed on a claim of ineffective assistance premised on the failure to call witnesses, a defendant need not

demonstrate a deprivation of a substantial defense. *People v Jurewicz*, 506 Mich 914, 915 (2020). Rather, the standard applicable to ineffective assistance for the failure to call witnesses is the same for all other such ineffective-assistance-of-counsel claims; it involves consideration of whether counsel's performance fell below an objective standard of reasonableness and, but for counsel's deficient performance, whether there is a reasonable probability that the outcome would have been different. *Id.*[15]

Phelps's affidavit indicated that she was 26-years old and at the Townsend home when the August 2022 police raid occurred. She then averred in pertinent part:

> 2. [Defendant] was also at that house on the above date at the time of the search warrant and he was arrested.
>
> 3. I knew [defendant] from seeing him at that house on previous occasions prior to that day. I had seen him there approximately three times over a period of two to three months.
>
> 4. During that time period, I had been inside the house approximately five to ten times. This house is known as a place to buy and use drugs. I knew other people that went to that house to buy and use drugs.
>
> 5. The occasions that I saw [defendant] at that house, he was there buying and using. I never saw him selling drugs to anyone in this house.
>
> 6. I've never seen [defendant] selling drugs. I've never heard that [defendant] was selling and I've never bought drugs from [defendant]. He was not selling drugs from [Townsend's] home.
>
> 7. At the time of [defendant's] trial, I was not contacted by his defense attorney or anyone from the attorney's office. If I would have been contacted I would have given the same statement in that [defendant] was not selling drugs from that house or anywhere else.

The trial court considered these portions of the Phelps affidavit. After summarizing the affidavit's content, the trial court denied the motion for new trial, stating in pertinent part:

> In essence, this would have been testimony that mirrored or added to testimony that [defendant] had obtained from Mr. Dane. The only person that testified that [defendant] was selling drugs was Edward Townsend. Mr. Townsend had testified that he claimed that he had seen [defendant] use meth and share it with others. He saw [defendant] with meth on the day of the raid and he observed him getting high off crack. Mr. Townsend claimed he saw [defendant] have a baggie of

---

[15] Although the *Jurewicz* decision was released by order, not an opinion, "Supreme Court orders that include a decision with an understandable rationale establish binding precedent." *People v Giovannini*, 271 Mich App 409, 414; 722 NW2d 237 (2006).

methamphetamine and claimed [defendant] told him he was going to sell it at [sic]. Mr. Townsend did not see [defendant] share the meth with anyone on August 16, 2022. Mr. Townsend did not see [defendant] sell drugs out of his residence on August 16, 2022. And only saw him sell drugs at [Dane's] address. Further stated that [defendant] was selling meth for the last year and he had seen [defendant] sell drugs at [Dane's] house.

Boiled down to its essentials, the testimony, even if given everything that was purported as true, there are a multitude of occasions that Miss Phelps would not have been present with [defendant] at the Tenth Street address. And it's certainly fair to characterize her testimony that she has never seen and she's never bought from. Well, that could very well be true, but that doesn't mean that [defendant] is not selling drugs either.

\* \* \*

In this particular case, the failure to call Miss Phelps at the time of trial, in this Court's opinion, certainly does not fall below an objective standard of reasonableness. Miss Phelps, given her affidavit, is somebody that would have run into [defendant] . . . three times over the period of two to three months. So, once a month maybe, if it was only two months then two times in one month and one time in another. And there was no indication that [defendant] would have been selling drugs to Miss Phelps. So the Court does not find that failure to call someone who's not residing at that address or spending a consider [sic] amount of time at that address would have offered more insight to the jury and that the failure to call her fell below an objective standard of reasonableness.

The other issue is that this is a known drug user, who certainly would have been cross examined similarly to the way that Mr. Dane was cross examined. The second prong of that, even if a high court upon review of this record find[s] that counsel's performance fell below an objective standard of reasonableness, the second prong is but for counsel's deficient performance there was a reasonable probability that the outcome would have been different.

This Court does not find that that second prong can be met in any fashion. The jury heard and was able to discern the credibility of Mr. Townsend. They were able to hear and discern the credibility of Mr. Dane. They were able to hear and discern the testimony of all of the other officers. They saw the drugs that [defendant] had on him at the time of the raid. And they were able to discern from all of that testimony that it was beyond a reasonable doubt that [defendant] possessed that methamphetamine with the intent to deliver it.

To me there is not a reasonable probability that the outcome would have been different if Miss Phelps would have been called to testify that she had seen [defendant] approximately three times over a period of two to three months, that she's never seen [defendant] selling drugs, and that she never bought drugs from

[defendant]. And that the occasions he was at the house, he was there buying and using. She had never seen him sell drugs in the house.

We cannot conclude that the trial court abused its discretion in denying defendant's motion for a new trial. *Rogers*, 335 Mich App at 191. Further, the trial court did not clearly err in its factual findings that Phelps's affidavit failed to demonstrate that defense counsel's performance was deficient. *Douglas*, 496 Mich at 592. And, the affidavit failed to support the underlying factual predicate for the claim of ineffective assistance of counsel and demonstrate a reasonable probability in a different outcome. *Id*.

Specifically, Phelps advised that she saw defendant three times in a two- to three-month period.[16] Phelps then stated that, during these limited contact periods, she did not see defendant sell drugs. Phelps then seemingly relied on hearsay, specifically the fact she never "heard" that defendant sold drugs, to conclude that he was merely a drug user and not a drug dealer. But it was apparent that Phelps had isolated contact with defendant and could not account for his actions on a daily or monthly basis. And, Phelps never disclosed her purpose at Townsend's home; whether she purchased drugs there; if so, the types of drugs purchased; and the impact of drug consumption, if any, on her perception and memory. Further, when the search warrant was executed, Phelps was in a back bedroom while defendant was apprehended in the dining area. In her affidavit, Phelps failed to disclose her degree of contact and conversation with defendant when they were both at Townsend's home and whether they were even in the same room. Indeed, if defendant was merely a street-level dealer selling drugs simply to fund his own habit, his infrequent sales would not be apparent to an acquaintance with whom he had few contacts, such as Phelps. In light of these deficiencies, we cannot conclude that the trial court's factual findings were clearly erroneous.

Defendant contends that the trial court erred in concluding that Phelps's affidavit mirrored the content of Dane's testimony because they addressed defendant's conduct at different houses and on different dates. Defendant's argument ignores the fact that the drug sale need not be witnessed or completed to support a conviction. To establish that a defendant possessed a controlled substance with the intent to deliver, the prosecution must prove beyond a reasonable doubt: (1) defendant's possession of a controlled substance; (2) defendant's knowledge of the possession of the controlled substance; (3) defendant's intent to deliver the controlled substance to another; and (4) the quantity of the substance, if applicable. *People v Robar*, 321 Mich App 106, 131; 910 NW2d 328 (2017). Specifically, a defendant is not required to convey his intention regarding the drugs to another person. And, there is no requirement that an individual witness a defendant's delivery of a controlled substance. Accordingly, Phelps's failure to view defendant engaged in a drug transaction and her opinion that defendant was merely a drug user did not demonstrate deficient performance by trial counsel. Nor did it establish a reasonable probability that, but for this failure to call Phelps, the outcome would have been different. *Jurewicz*, 506 Mich at 915.

---

[16] Like the trial court, we presume that Phelps's knowledge was from the pertinent time period, the summer of 2022.

-10-

After the *Ginther* hearing, defendant filed a supplemental brief,[17] contending that the trial court erred in failing to determine that trial counsel was ineffective by not investigating Phelps and calling her to testify at trial. To support his contention that the trial court erred, defendant argues that defendant's testimony, that he asked Rubin to locate, interview, and subpoena Phelps for trial, was credible.[18] However, "if resolution of a disputed factual question turns on the credibility of witnesses or the weight of the evidence, we will defer to the trial court, which had a superior opportunity to evaluate these matters." *People v Sexton*, 461 Mich 746, 752; 609 NW2d 822 (2000). Indeed, issues of credibility are left to the fact-finder and are not resolved anew by the appellate court. *People v Kissner*, 292 Mich App 526, 534; 808 NW2d 522 (2011). In this case, the trial court expressly found that Rubin's testimony was credible that defendant never asked him to locate Phelps or subpoena her for trial. Moreover, the trial court concluded that it was a matter of trial strategy not to call any more witnesses that were drug users in a case where the issue was whether defendant was engaged in drug dealing. Additionally, the trial court determined that Phelps's limited contact with defendant, only three occasions, would not have affected the outcome of the proceedings. We cannot conclude that these factual findings are clearly erroneous. *Trakhtenberg*, 493 Mich at 47. This claim of error does not entitle defendant to appellate relief.

## III. ADMISSION OF DRUG PROFILE EVIDENCE

Defendant contends that the trial court abused its discretion by allowing testimony regarding drug profile evidence because it constituted substantive evidence of guilt. We disagree.

"A trial court's decision to admit evidence will not be disturbed absent an abuse of discretion." *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017). "[T]he determination

---

[17] Our order remanding this matter for a *Ginther* hearing limited the proceedings to the issue raised in defendant's brief on appeal. *People v Livingston*, unpublished order of the Court of Appeals, entered February 21, 2025 (Docket No. 366404). Despite this limitation, defendant raises a new issue in his supplemental brief, contending that the trial court erred in failing to allow Peebles to testify regarding statements made to him by Phelps, holding it was inadmissible hearsay. When this Court remands a case with specific limiting instructions, it is improper to exceed the scope of the order. See *People v Russell*, 297 Mich App 707, 714; 825 NW2d 623 (2012). Additionally, after the trial court held that the evidence was inadmissible, appellate defense counsel failed to make an offer of proof of the statements that Phelps purportedly made to Peebles. See MRE103(a)(2). This failure by itself supports the determination that the trial court did not abuse its discretion by excluding the evidence. *People v King*, 297 Mich App 465, 476; 824 NW2d 258 (2012).

[18] Appellate defense counsel contends that defendant's testimony was credible, particularly when compared to Rubin's testimony. Yet, defendant testified that he saw Phelps at the jail on two occasions. Specifically, he saw Phelps near the tv and the green chairs when they were two rows apart, and Phelps agreed to testify on his behalf. But, male and female inmates are to be separated by sight and sound. See MCL 801.104 ("Male and female prisoners, unless they are husband and wife, shall not be put, kept, or confined in the same room in any jail, lock-up, holding center, or holding cell."). The feasibility and veracity of defendant's testimony was not corroborated by any jail employee or record.

-11-

regarding the qualification of an expert and the admissibility of expert testimony is within the trial court's discretion." *People v Hawkins*, ___ Mich App___, ___; ___ NW2d ___ (2023) (Docket No. 365076); slip op at 2, quoting *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008). "An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes." *People v McBurrows*, 322 Mich App 404, 411; 913 NW2d 342 (2017), aff'd 504 Mich 308 (2019). "[A]n abuse of discretion standard acknowledges that there will be circumstances in which there will be no single correct outcome; rather, there will be more than one reasonable and principled outcome." *People v Babcock*, 469 Mich 247, 269; 666 NW2d 231 (2003). "[I]t is necessarily an abuse of discretion to admit legally inadmissible evidence." *People v Lowrey*, 342 Mich App 99, 108; 993 NW2d 62 (2022). "This Court also reviews a trial court's decision on a motion in limine for an abuse of discretion." *Hawkins*, ___ Mich App at ___; slip op at 2.

"Drug profile evidence has been described as an informal compilation of characteristics often displayed by those trafficking in drugs." *People v Murray*, 234 Mich App 46, 52; 593 NW2d 690 (1999) (quotation marks and citation omitted). "Drug profile evidence is essentially a compilation of otherwise innocuous characteristics that many drug dealers exhibit . . . ." *Id*. at 52-53. While a majority of courts have held drug profile evidence is inadmissible as substantive evidence of guilt, "this Court has held that a prosecutor may use expert testimony from police officers to aid the jury in understanding evidence in controlled substance cases." *Id*. at 53. "For such expert testimony to be admissible: (1) the expert must be qualified; (2) the evidence must serve to give the trier of fact a better understanding of the evidence or assist in determining a fact in issue; and (3) the evidence must be from a recognized discipline." *Id*. (quotation marks and citation omitted). "However, when the testimony at issue is a drug profile, the expert may not move beyond an explanation of the typical characteristics of drug dealing . . . and opine that the defendant is guilty merely because he fits the drug profile" *Id*. at 54.

The *Murray* Court provided guidance on how to distinguish between appropriate and inappropriate use of drug profile evidence to aid in determining its admissibility:

> First, the reason given and accepted for the admission of the profile testimony must only be for a proper use—to assist the jury as background or modus operandi explanation. Attorneys and courts must clearly maintain the distinction between the profile and the substantive evidence, and the former should not argue that the profile has any value in itself; it is only an aid for the jury. Second, the profile, without more, should not normally enable a jury to infer the defendant's guilt. The prosecutor must introduce and argue some additional evidence from the case that the jury can use to draw an inference of criminality; multiple pieces of a profile do not add up to guilt without something more. In other words, the pieces of the drug profile by themselves should not be used to establish the link between innocuous evidence and guilt. Third, because the focus is primarily on the jury's use of the profile, courts must make clear what is and what is not an appropriate use of the profile evidence. Thus, it is usually necessary for the court to instruct the jury with regard to the proper and limited use of profile testimony. Fourth, the expert witness should not express his opinion, based on a profile, that the defendant is guilty, nor should he expressly compare the defendant's characteristics to the profile in such a

way that guilt is necessarily implied. [*Id*. at 56-58 (quotation marks and citations omitted).]

When expert testimony about drug use and drug trafficking is not within the knowledge of a layman and aids the jury in determining the defendant's intent, the testimony is admissible even if it encompasses the ultimate issue of intent to deliver. *People v Ray*, 191 Mich App 706, 708; 479 NW2d 1 (1991).

Defendant submits that the trial court abused its discretion by admitting Officer Daly's drug profile testimony[19] because it closely resembled the facts and circumstances of defendant's case and the drug profile evidence was used to establish substantive guilt, particularly when other officers testified to the drug profile.

As noted, in order to admit expert opinion pertaining to drug trafficking, "(1) the expert must be qualified; (2) the evidence must serve to give the trier of fact a better understanding of the evidence or assist in determining a fact in issue; and (3) the evidence must be from a recognized discipline." *Murray*, 234 Mich App at 53-54 (quotation marks and citation omitted).

The parties did not dispute that Officer Daly was an expert in local drug trafficking. He was able to identify: (a) the prices of methamphetamine in St. Clair County; (b) the difference between the weight of the drugs typically carried by drug users and drug dealers; (c) the reason users become dealers; (d) the definition of a drug flophouse; (e) the packaging methods used to sell methamphetamine; and (f) items associated with drug trafficking. The trial court determined the drug profile evidence would help the trier of fact understand the evidence, stating: "The vast majority of jurors will have, I would suspect, no experience with drug trafficking, no experience with understanding how drugs are packaged or what would be expected to be found on a user of narcotics." Lastly, the trial court limited Officer Daly's testimony to express his opinion on the drug trafficking trends in St. Clair County. He could not opine about or compare the facts of defendant's case to the drug profile evidence.

The trial court determined Officer Daly was an expert in the field of drug trafficking as evidenced by the parties' stipulation. Further, the prosecution presented Officer Daly's qualifications at trial, and the trial court confirmed his expert status. Defendant did not object to Officer Daly being qualified as an expert at trial. With respect to the drug profile evidence, Officer Daly provided specific details about drug trafficking in St. Clair County as described above. Because the terminology, pricing, and specific weights of methamphetamine were relevant to the case, the trial court determined the drug profile evidence would help the jury understand these concepts. There was no indication that Officer Daly tailored his explanation of the process and manner of drug trafficking to defendant's facts and circumstances. The trial court explicitly limited Officer Daly's drug profile evidence and he was precluded from opining about defendant's case or the facts of the case as they related to the drug profile. The trial court's decision was grounded in accepted principles regarding the admission of drug profile evidence. *Murray*, 234

---

[19] To address defendant's motion in limine, the trial court held a hearing in accordance with *Daubert v Merrell Dow Pharm, Inc*, 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993). At the *Daubert* hearing, Officer Daly delineated his experience and training.

Mich App at 56-58.  The trial court did not abuse its discretion when it denied defendant's motion in limine seeking to exclude Officer Daly's testimony.  *Lowrey*, 342 Mich App at 108.

We further reject the contention that drug profile evidence was used as substantive evidence of guilt and improperly admitted by two other officers.  After Officer Daly provided the foundation for the facts and circumstances underlying drug trafficking, he gave testimony addressing the particular factual circumstances of the raid.  The testimony of Officer Daly and Townsend established that Townsend's home was the subject of a search in July 2022, and a second search warrant was executed in August 2022.  Townsend was the target of the investigation.  During the search of Townsend's home, items with a seemingly innocuous purpose, such as sandwich bags and a scale, were found that, collectively and in the manner used, reflected that drugs sales were occurring from the home.  Although Townsend was the subject of the investigation, defendant's conduct, failing to show his hands, dropping a pill bottle from his pocket, and a baggie with "dealer-ends" in another pocket, caused the police to further investigate the contents of the items dropped from or on defendant's person.  The officers' testimony was not designed to supplant the role of the jury and reach the ultimate issue, but to address defense counsel's theory that the items recovered from defendant reflected only personal use.  The testimony[20] addressing the baggies, the manner of tying the ends, and the quantity of methamphetamine was not within a layman's knowledge and aided the jury in determining the elements of the possession with intent to deliver charge.  *Ray*, 191 Mich App at 708.  Further, the trial court informed the jury the drug profile evidence "is not to be used to determine whether the Defendant committed the crime charged in his case."  "Jurors are presumed to follow their instructions."  *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011).  Accordingly, the admission of the drug profile evidence did not constitute an abuse of discretion under the circumstances.  *Denson*, 500 Mich at 396.

## IV.  GREAT WEIGHT OF THE EVIDENCE

Defendant asserts that the verdict was against the great weight of the evidence and an actually innocent person may have been convicted because there was no evidence of drug sales or sharing by defendant.  We disagree.

"We review for an abuse of discretion a trial court's grant or denial of a motion for a new trial on the ground that the verdict was against the great weight of the evidence."  *People v Lacalamita*, 286 Mich App 467, 469; 780 NW2d 311 (2009).  "An abuse of discretion occurs when a trial court chooses an outcome falling outside the range of reasonable and principled outcomes." *Id*.

Defendant argues his conviction was against the great weight of the evidence.  "The test to determine whether a verdict is against the great weight of the evidence is whether the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the

---

[20] Moreover, there is no indication that the remaining officers were providing expert testimony when, in the course of securing the home and gathering evidence, they took photographs of or removed items from Townsend's home in accordance with the execution of the search warrant. The lay opinion regarding the nature and value of the items was not improper.

verdict to stand." *People v Knepper*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 363191); slip op at 5 (quotation marks and citation omitted). "Generally, a verdict may be vacated only when the evidence does not reasonably support it and it was more likely the result of causes outside the record, such as passion, prejudice, sympathy, or some other extraneous influence." *Lacalamita*, 286 Mich App at 469. " 'Conflicting testimony, even when impeached to some extent, is an insufficient ground for granting a new trial.' " *Id*. at 469-470, quoting *People v Lemmon*, 456 Mich 625, 647; 576 NW2d 129 (1998). "Further, the resolution of credibility questions is within the exclusive province of the jury." *Lacalamita*, 286 Mich App at 470. "Thus, to obtain a new trial, the defendant must establish that one of these circumstances exists, and that there is a 'real concern that an innocent person may have been convicted or that it would be a manifest injustice to allow the guilty verdict to stand.' " *Knepper*, ___ Mich App at ___; slip op at 6, quoting *Lemmon*, 456 Mich at 644.

As noted, the elements of possession with intent to deliver are: "(1) that a defendant possessed a controlled substance, (2) that the defendant knew he or she possessed the controlled substance, (3) that the defendant intended to deliver the controlled substance to someone else, and (4) the amount of the controlled substance, if applicable." *Robar*, 321 Mich App at 131. Defendant only challenges the third element of possession with intent to deliver, claiming that he merely possessed methamphetamine in baggies ready for sale and no one actually saw him sell or share it.

Defendant's argument with respect to Townsend's testimony lacks merit. Testimony, even when contradicted or impeached, is not sufficient to grant a new trial. *Lacalamita*, 286 Mich App at 469-470. It was Townsend who claimed defendant intended to sell methamphetamine. Accordingly, any contradiction in Townsend's testimony alone is insufficient to support defendant's argument. Further, credibility determinations are only made by the jury. *Id*. at 470.

On appeal, defendant contends that the intent to sell or deliver was lacking because no one saw him sell or share methamphetamine. Defendant's argument that someone must view defendant engage in a drug transaction is without merit. Because of the difficulty in proving an actor's intent or state of mind, an intent to sell or deliver may be established with only minimal circumstantial evidence. See *People v Smith*, 336 Mich App 297, 308; 970 NW2d 450 (2021). And, the question of intent and the honesty of belief involves weighing of the evidence, a task reserved for the jury. *Id*.

When raising this argument, defendant solely focuses on Townsend's testimony and ignores the circumstantial evidence of and expert testimony about drug trafficking. Defendant was found in a known drug house, which everyone admitted was where people bought, sold, and used drugs. Officer Daly supplied drug profile evidence, describing the difference between drug users and dealers. Specifically, he explained the difference between dealer- and user-end baggies. Officer Daly also delineated how drug users often become small-time dealers in order to fund their own habit. The drug profile evidence listed items typically associated with drug trafficking, including scales and sandwich bags.

At trial and on appeal, defense counsel admitted[21] that defendant had methamphetamine in dealer-end baggies on his person to support that his only offense involved possession. But, defendant ignored the fact that he had additional methamphetamine hidden in a pill bottle. Additionally, sandwich bags and a scale were found in the home in proximity to defendant. Townsend admitted many different people used his house to sell and use drugs. It follows that the scale could have been used by anyone in the home to sell drugs.

We conclude that defendant's challenge to the great weight of the evidence premised on a lack of evidence demonstrating he actually sold methamphetamine is without merit. The act of selling the drug is not an element of the offense, rather it is the intent to sell. See *Robar*, 321 Mich App at 131. Defendant was found in a drug house used for buying, selling, and using drugs. The house contained drug trafficking items. Townsend provided testimony that defendant intended to sell the methamphetamine he had. Defendant possessed 4.2 grams of methamphetamine in dealer-end baggies, some of which was hidden in a pill bottle. Defendant's challenge to the facts and circumstances underlying the elements of the offense presented issues for resolution by the trier of fact. Consequently, defendant is not entitled to a new trial. See *Lacalamita*, 286 Mich App at 469 ("Generally, a verdict may be vacated only when the evidence does not reasonably support it.").

## V. SENTENCE

Lastly, defendant contends that his sentence is unreasonable and disproportionate in light of his age, health issues, addiction, family support, and criminal history. We disagree.

"This Court reviews the proportionality of a trial court's sentence for an abuse of discretion." *People v Foster*, 319 Mich App 365, 375; 901 NW2d 127 (2017). "A given sentence constitutes an abuse of discretion if that sentence violates the principle of proportionality, which requires that the sentence be proportional to the seriousness of the circumstances surrounding the offense and offender." *People v Lowery*, 258 Mich App 167, 172; 673 NW2d 107 (2003). "[A]ppellate courts must review all sentences for reasonableness, which requires the reviewing court to consider whether the sentence is proportionate to the seriousness of the matter." *People v Posey*, 512 Mich 317, 353; 1 NW3d 101 (2023) (BOLDEN, J.).[22] "A sentence that adheres to the guidelines' recommended range is reviewed for proportionality." *Id*. at 352. "When a trial court sentences a defendant within the guidelines' recommended range, it creates a presumption that the sentence is proportionate." *Id*. at 360.

" 'In order to overcome the presumption that the sentence is proportionate, a defendant must present unusual circumstances that would render the presumptively proportionate sentence disproportionate.' " *People v Burkett*, 337 Mich App 631, 637; 976 NW2d 864 (2021), quoting *People v Bowling*, 299 Mich App 552, 558; 830 NW2d 800 (2013). "The principles that guide proportional sentencing in our state are: '(a) the reformation of the offender, (b) protection of

---

[21] Defendant did not testify at trial.

[22] While *Posey* was a plurality opinion that is not technically binding, this Court held "it [is] prudent to follow the holding in the interest of judicial economy." *People v Purdle (On Remand)*, ___ Mich App ___, ___; ___ NW3d ___ (2024), slip op at 4 (Docket No. 353821).

society, (c) the disciplining of the wrongdoer, and (d) the deterrence of others from committing like offenses.' " *People v Bennett*, 335 Mich App 409, 418; 966 NW2d 768 (2021), quoting *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972).

Defendant's minimum sentencing guidelines were 72 to 240 months' imprisonment. He was sentenced to 7 to 25 years' imprisonment, or 84 to 300 months' imprisonment. Because defendant's minimum sentence was within the sentencing guidelines, it is presumed to be proportional. *Posey*, 512 Mich at 360. Defendant must demonstrate unusual circumstances rendering his proportional sentence disproportionate. *Burkett*, 337 Mich App at 637.

Specifically, defendant challenges his sentence as disproportionate and unreasonable because the trial court failed to consider: (1) defendant's addiction to methamphetamine; (2) defendant's age and health; (3) the circumstances of defendant's arrest; (4) defendant's familial support; and (5) the sentencing guidelines were inflated by defendant's old convictions from over 30 years ago.

First, defendant argues that because he is an addict, he would benefit from rehabilitation rather than prison. He also maintains his desire to enter rehabilitation to get clean. Defendant does not provide a reason why this wish to get clean is an unusual circumstance rendering his sentence disproportionate. Defendant appears to state it is his desire to get clean, but this is not enough to rebut the presumption of proportionality. Further, defendant made a phone call while in jail awaiting trial telling the person on the other end he wanted to get into rehabilitation because it would look good. Defendant's desire to get clean is not an unusual circumstance and his intention to get clean is suspect.

Second, defendant argues his age and health were not taken into consideration. Once again, defendant does not explain how his age and health are unusual circumstances. Both his health and age were described in the Presentence Investigation Report (PSIR), which the trial court had at sentencing. Defendant being older and suffering from some medical conditions are not unusual circumstances rendering his sentence disproportionate.

Third, defendant claims the trial court failed to consider the circumstances of his arrest. Defendant argues that the target of the warrant and raid was Townsend, and defendant was "at the wrong place at the wrong time." The trial court was aware of the facts from the witnesses' testimony. Moreover, defendant does not explain how the facts of his case are unusual circumstances. Defendant was in the drug house when it was raided. While unfortunate timing for defendant, this was not an unusual circumstance.

Fourth, defendant claims he has strong familial support and his family wants to ensure that his needs are met. Again, defendant does not explain how having a family support group is an unusual circumstance. Defendant argues some of his siblings are elderly and may pass while he is imprisoned, but defendant does not provide any evidence suggesting his siblings are at that point. Further, the PSIR indicates that defendant does not have a support system.

Finally, defendant maintains his minimum sentencing guidelines were inflated because of his old convictions. Defendant argues absent his 30-year-old prior convictions, his minimum sentencing guidelines would have been different. This argument appears to challenge the PSIR's

minimum sentencing guidelines. Defendant did not object to the inclusion of his prior convictions at sentencing, making this argument unpreserved for review. See *People v Clark*, 315 Mich App 219, 223-224; 888 NW2d 309 (2016) ("To preserve a sentencing issue for appeal, a defendant must raise the issue at sentencing, in a proper motion for resentencing, or in a proper motion to remand filed in the court of appeals." (citation and quotations omitted).). Moreover, defendant fails to explain how having old felony convictions is an unusual circumstance. Defendant admits he is an older gentleman, so it follows his criminal history would be over a longer span of time.

In addition, at sentencing, the trial court explained it was aware of the facts of the case because of the evidence presented at trial, like the body-camera video of the raid. The trial court analyzed defendant's prior criminal history, noting the timespan of the convictions and types of convictions. Further, the trial court did not consider defendant's bond violation, which involved narcotics possession. Because defendant failed to rebut the presumption of proportionality, his sentence was not disproportionate or unreasonable. *Burkett*, 337 Mich App at 637. Consequently, the trial court did not abuse its discretion when it sentenced defendant to 84 to 300 months' imprisonment. *Lowery*, 258 Mich App at 172.

Affirmed.

/s/ Christopher P. Yates
/s/ Anica Letica

N.P. Hood, J. did not participate.